**TEACHERS' RETIREMENT SYSTEM OF LOUISIANA, Plaintiff,**

v.

**M. Bernard AIDINOFF, et al., Defendants,**

and

**American International Group, Inc., a Delaware corporation, Nominal Defendant.**

C.A. No. 20106.

Court of Chancery of Delaware, New Castle County.

Submitted: May 24, 2006.
Decided: June 21, 2006.

Stuart M. Grant, Esquire, Cynthia A. Calder, Esquire, Grant & Eisenhofer, P.A., Wilmington, Delaware, Attorneys for Plaintiff.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Nicholas A. Gravante, Jr., Esquire, Steven I. Froot, Esquire, Boies, Schiller & Flexner LLP, New York, New York; David Boies, Esquire Boies, Schiller & Flexner, LLP, Armonk, New York; Attorneys for Defendants Maurice R. Greenberg and Edward E. Matthews.

Kurt M. Heyman, Esquire, Patricia L. Enerio, Esquire, Proctor Heyman LLP, Wilmington, Delaware; Vincent A. Sama, Esquire, Eric M. Robinson Esquire, Winston & Strawn LLP, New York, New

York; Attorneys for Defendant Howard I. Smith.

Andre G. Bouchard, Esquire, Joel Friedlander, Esquire, James G. McMillan, III, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware, Attorneys for Defendant C.V. Starr & Co., Inc.

## OPINION

STRINE, Vice Chancellor.

In this case, plaintiff Teachers' Retirement System of Louisiana ("Teachers") seeks relief, on behalf of nominal defendant American International Group ("AIG"), against four defendants: Maurice R. Greenberg, Edward E. Matthews, Howard I. Smith, and C.V. Starr & Co., Inc. ("Starr"). AIG is one of the world's most valuable businesses, and it serves as a holding company for a wide array of companies that sell a diverse range of insurance products, investment services, and financial management services. Defendant Greenberg was AIG's Chairman and Chief Executive Officer for over a quarter of a century, having only left those posts in early 2005 after AIG announced that it had overstated its (still formidable) value by billions of dollars. Defendant Matthews was the Senior Vice Chairman for Investments and Financial Services of AIG and a director of AIG until his retirement in 2003. Defendant Smith served for many years under Greenberg as AIG's Executive Vice President and CFO, and served on AIG's board. Like Greenberg, Smith is alleged to have been fired from his managerial positions in early 2005 under the cloud of AIG's improper accounting practices.[1]

The final defendant, Starr, is a corporation that operates four general insurance agencies. Allegedly, Starr's only customer is AIG itself. At the times relevant to this case, Starr was controlled and owned by top AIG Executives, with Greenberg being Starr's largest stockholder, Chairman, and CEO. Matthews and Smith were Starr's second and third-largest stockholders and were also directors.

In the complaint, Teachers alleges that Starr operated as a method for Greenberg to compensate himself and other top AIG executives, like Matthews and Smith, at the expense of AIG. According to Teachers, Starr did nothing that AIG could not do for itself. Its key employees were all AIG employees. But, by purporting to be a separate entity, Starr was able to secure substantial payments from AIG and from reinsurers dealing with AIG, which generated extremely large compensation for Starr's stockholders. Teachers alleges that had AIG been operating properly, the hundreds of millions of dollars that flowed from AIG to Starr during the period 1999 to 2004 would have remained with AIG, instead of having been diverted into Starr for the benefit of AIG's conflicted managers. In other words, Teachers alleges that Starr's supposedly separate operational status was a sham. All of its know-how and overhead came from AIG itself and there was no need for AIG to use a separate entity to carry out transactions in an insurance industry in which it was the recognized leader. The only reason for the separation was that it permitted Greenberg and his managerial team to reap excess profits in their capacity as Starr stockholders, by siphoning commissions and premiums available to AIG itself into an entity whose profits flowed exclusively to AIG managers.

The complaint alleges that this pattern of business went on at AIG for at least two decades before the period challenged in the complaint—1999 to 2004. But, the

[1]. Am. Compl. ¶ 17.

complaint also makes clear that the decision to continue the practice was one that AIG made annually. According to the complaint, a supine AIG board did not bother to inform itself of the nature of the AIG–Starr relationship. To the extent that it approved the continuation of the Starr relationship, it did so only after cursory presentations from Greenberg himself, who was Starr's largest stockholder and CEO.

The complaint also challenges $28.1 million in payments AIG made from 1999 to 2003 to Starr International Co., Inc. ("SICO"). SICO is an entity that Greenberg allegedly used as a vehicle to provide long-term incentive compensation to top AIG executives, compensation that was allegedly dependent on their fealty to him and their willingness to remain at AIG. Like Starr, SICO was owned and controlled by top AIG executives, with defendants Greenberg, Matthews, and Smith each owning large blocks of SICO stock and serving as SICO directors.

Teachers contends that the consideration SICO provided to AIG in exchange for the $28.1 million is entirely a mystery, even to AIG's board. According to Teachers, the AIG board only received clipped briefings from Greenberg himself about the relationship between SICO and AIG, and did not set or give informed approval to the terms upon which SICO received payments from AIG.

In this opinion, I consider the motions to dismiss advanced by Greenberg, Matthews, Smith, and Starr. Smith and Starr premise their arguments largely on the joint briefs of Greenberg and Matthews but also advance a couple of unique arguments. The two key arguments made by all the defendants are: 1) that the claims in the complaint relating to payments made to Starr are time-barred; and 2)

that none of the claims in the complaint are viable as a matter of law.

After considering the arguments of the parties, I largely deny the motion to dismiss. Initially, I reject the notion that all of the Starr claims are time-barred. Although it is true that the relationship with Starr dates back at least as far as the era of punk rock and disco, AIG had no contractual duty to place business through Starr and had an annual opportunity to terminate its contracts with Starr, upon relatively short notice. Therefore, Teachers is free to challenge the payments to Starr made by AIG on or after January 1, 2000, which is three years before the filing of Teachers' initial complaint. By contrast, Teachers cannot challenge the payments to Starr in 1999 or earlier because it has no cognizable excuse for failing to bring a timely suit attacking their propriety.

Thereafter, I conclude that Teachers, under notice pleading standards, has stated a claim as to the payments to Starr. The complaint pleads specific facts suggesting that there was no necessity for AIG to employ Starr to perform services AIG was competent to perform itself, especially given that the key Starr employees were also AIG executives. The pled facts also suggest an improper motive for this odd arrangement, as Starr was owned and controlled by top AIG executives who stood to benefit, at AIG's expense, from the revenue streams diverted into Starr. As important, the complaint pleads that those members of the AIG board who were not Starr stockholders only received a few moments of briefing from Greenberg about the Starr–AIG relationship and did not make an informed business judgment to approve these transactions. Viewed in the light most favorable to Teachers, as they must be, the pled facts support a claim for breach of the duty of loyalty against

Greenberg, Matthews and Smith, who reaped millions of dollars in compensation from Starr as a result of its relationship with AIG. The complaint supports an inference that the top managers of AIG dictated the terms of the AIG–Starr relationship without the informed oversight and approval of the supposedly independent directors on the AIG board and benefited themselves at the expense of AIG.

On this same topic, I also deny Starr's motion to dismiss. Although the count against Starr is pled awkwardly as a count for a specific type of equitable remedy, a constructive trust, rather than as a proper cause of action, the complaint states a claim against Starr. Because Starr was controlled by AIG's top managers, Starr is properly charged with possessing their knowledge and motives. Therefore, the complaint easily states a claim against Starr for aiding and abetting a breach of fiduciary duty, as Starr was the conduit that Greenberg, Matthews, Smith, and other top AIG executives allegedly used to divert revenues from AIG to themselves. Likewise, the complaint pleads facts supporting a cause of action for unjust enrichment against Starr.

Finally, I also determine that the complaint states a claim as to the payments to SICO. Although there are few facts in the complaint regarding this claim, they are sufficient to state a claim. Those facts allege that AIG made $28.1 million in payments to SICO—an entity owned and controlled by AIG top executives including Greenberg, Matthews, and Smith—without the informed review and approval of AIG's allegedly independent directors. As was the case with Starr, Teachers alleges that the AIG board's outside members were not properly informed about the AIG–SICO relationship and were not even aware of the consideration AIG supposedly received that justified the payments to SICO. On

the pled facts, the burden to demonstrate the fairness of the payments to SICO rests on the defendants, as the proponents of a conflicted transaction executed without the use of any recognized device that would invoke the business judgment rule standard of review.

## I. *Procedural Background*

Teachers originally filed this derivative action on December 31, 2002. Teachers alleges that it has continuously held stock in AIG since 1999, the first year for which Teachers seeks relief for AIG.

This action has had an accordion-like quality. In its initial stages, this case focused solely on claims relating to allegedly improper transactions between AIG and Starr and SICO (respectively, the "Starr and SICO Claims"). The procession of the case was halted for some time after AIG formed a special litigation committee to investigate the allegations of the complaint. In August 2003, the SLC moved to terminate this litigation and briefing on that motion was completed in April 2005.

By that time, however, several serious problems at AIG surfaced, in no small part because of the work of government investigators. Eventually, AIG conceded that its financial statements missed the mark by billions of dollars, creating a crisis of confidence in a corporation whose financial performance had been superior for decades. Even worse, the inaccuracies allegedly resulted from consciously improper transactions, whereby AIG inflated its financial strength through reinsurance contracts that, in economic fact, did not shift risk away from AIG. Additional improprieties were alleged in the form of complicity in a bid-rigging scheme whereby AIG collaborated with a large insurance broker, Marsh & McLennan Companies, Inc., in defrauding the broker's clients by creating

the appearance of competitive bidding, when Marsh was doling out the insurance to certain pre-determined insurers, including AIG. In the wake of these events, AIG's long-time CEO, defendant Maurice R. "Hank" Greenberg, left his post as CEO and defendant Howard I. Smith, AIG's Executive Vice President and CFO, was relieved of his managerial duties. Both also eventually left their posts as directors of AIG.

Teachers amended its complaint in May 2005 to bring a broad set of allegations relating to these new problems. That resulted in the need for coordination with other actions filed in this court, and the courts of other jurisdictions, relating to those new problems. After efforts to that end, it was determined that this case would proceed, but in a narrower form consistent with the case's original scope. That is, this case would focus solely upon the Starr and SICO Claims. The counts of the complaint other than those relating to Starr and SICO were voluntarily dismissed in favor of another consolidated action pending in this court, which has now been stayed in deference to an investigation by yet another AIG special litigation committee.

As important, in January 2006, the original AIG special litigation committee changed its previous view that that the Starr and SICO Claims should be dismissed. In a compromise with Teachers, the special litigation committee, on behalf of AIG, agreed to allow Teachers to proceed with the Starr and SICO Claims against defendants Greenberg, Matthews, and Smith, who were directors and officers of AIG, the three largest stockholders in Starr, and stockholders in SICO (collectively, the "Managerial Defendants"), as well as against Starr itself. By virtue of that compromise, the AIG director-defendants who did not own stock in Starr and SICO were dismissed with prejudice from this action. Teachers also agreed to dismiss without prejudice the claims against those AIG director-defendants who owned stock in Starr other than Greenberg, Matthews, and Smith.

Because of the compromise with the special litigation committee, the procedural standard applicable to a challenge to the complaint changed profoundly. Teachers now proceeds with the blessing of the board committee at AIG entrusted with the authority to determine whether to bring the Starr and SICO Claims. As a result, the Managerial Defendants and Starr cannot challenge the Teachers' complaint for failure to plead demand excusal under the particularized pleading requirements governing Rule 23.1 motions. Instead, they face the more difficult challenge of proving that the complaint fails to state a claim upon which relief could be granted, under the liberal notice pleading standard applicable to Rule 12(b)(6) motions.

## II. The Factual Allegations In The Complaint

The following recitation of facts is drawn from Teachers' current complaint. AIG was founded in 1919 by Cornelius Vander Starr as an insurance company. Originally, AIG sold its insurance products through its own insurance agencies. In 1962, AIG changed its business model, sold off its insurance agencies, and began operating as a commercial insurer selling its products through brokers.

In 1967, the AIG holding company structure that still persists was created. The United States assets of AIG were transferred to the entity that was then newly incorporated as AIG. The non-U.S. assets remained with two privately-held companies: Starr and SICO. In 1969, AIG went public. Soon thereafter, the non-U.S. as-

sets of the two privately-held companies were transferred to AIG in exchange for AIG stock.

By this period, defendant Greenberg was at the helm of AIG and led the restructuring. The aspects of that restructuring that are now relevant are those that involve Starr and SICO, and their relationship to AIG.

## A. *Starr*

When Starr transferred its foreign assets in return for AIG stock in the late 1960s, it retained certain domestic insurance agencies which it owned. According to Greenberg, Starr retained these assets because they were small, insignificant, and unprofitable, and he desired to avoid saddling AIG with "money-losing operations."[2]

Over time, the four domestic agencies Starr retained—Starr Aviation, Starr Marine, Starr California, and Starr Tech—grew to become highly profitable. This growth benefited Starr's owners, who were all members of AIG's top management. According to the plaintiffs, Starr was known within AIG as the "Billionaires Club" and grants of equity in Starr were used by Greenberg as a tool to reward and maintain loyalty by top AIG executives.[3]

During the 1970s, AIG entered into contracts with the Starr agencies whereby Starr would act as an agent for selling certain AIG products and finding reinsurance for AIG (the "MGA Agreements"). The complaint does not focus on the precise terms of those contracts, but the defendants have placed them in the record. By each of their terms, AIG had an annual opportunity to cancel each contract.[4]

The complaint then fast-forwards from the retention of the insurance agencies by Starr to the late 1990s. By that time, Starr was receiving hundreds of millions of dollars in revenues for two major sources of activity. First, Starr sold AIG insurance products and received commissions as the selling agent. Second, Starr derived substantial revenues from non-AIG reinsurers who reinsure the business that Starr produces for AIG.

Teachers alleges that neither of these streams of revenues properly belonged to Starr. The reason for that is simple.

According to Teachers, AIG provided Starr with all of its support services and, even more importantly, with most of its key human capital. The top employees at the Starr agencies were the same executives who were employed at the AIG companies that mirrored Star's business. For example, the president of Starr Marine, the Starr agency that sold marine insurance, was also the president of AIU Marine, AIG's own marine insurance company. Likewise, the top two executives at Starr Aviation held the identical positions at AIG's own aviation insurance company, AIG Aviation. At least thirty of Starr Aviation's sixty-three employees were also AIG employees. Put simply, Teachers pleads that there is nothing that Starr does that AIG cannot do, and that most of what Starr does is shaped by strategies and know-how provided to it by key AIG employees.

Therefore, Teachers says that there was no need for AIG to divert large streams of the sales profits from its insurance business to Starr on the false pretext that Starr was a separate company with expertise that AIG itself lacked. AIG could

---

2. Am. Compl. ¶ 41.

3. *Id.* at ¶ 55.

4. Greenberg and Matthews Op. Br. at Exs. B, C, D, and E.

have performed the same function as Starr in-house, using many of the same personnel, and thereby captured more of the profit for itself. Instead, revenues AIG could have secured for itself flowed into Starr, and then out of Starr for the benefit of its owners, who were all AIG top executives.

Compounding this problem, says Teachers, were Starr's improper practices. According to Teachers, it is industry practice for an insurer who pays the acquisition costs of procuring reinsurance to receive the commission paid by the reinsurer. Under its contracts with Starr, AIG paid all the acquisition costs of reinsurance. But instead of transferring the reinsurance commissions to AIG to reduce AIG's costs, Starr kept those reinsurance commissions for itself, allegedly benefiting itself by $66 million during the period 1999 to 2002.

These and other practices, Teachers claims, advantaged Starr to the unfair detriment of AIG. That advantage enabled defendants Greenberg, Matthews, and Smith to reap large payouts from Starr, which were larger than what they received from AIG itself. Furthermore, Teachers contends that the enrichment of Starr helped Greenberg secure control over the AIG organization because he would personally (through his domination of the Starr board) select the AIG executives invited to become equity owners in Starr. The prospect of becoming a member of the "Billionaires Club" led executives at AIG to want to secure and maintain Greenberg's favor.

## B. *SICO*

The other major claim in the case centers on another affiliate of AIG that Greenberg allegedly controlled: SICO. At the time AIG was reorganized in the late 1960s, SICO received a large bloc of AIG stock. Beginning in 1975, SICO set up a series of long-term incentive plans to benefit AIG executives. The "LTIPs" involved grants of equity in AIG and were tied to commitments by the employees to remain with AIG until they reached age 65. A broader base of AIG executives participated in the SICO LTIPs than became equity owners in Starr, and invitations were issued at the instance of the SICO board, which was allegedly controlled firmly by Greenberg and his top managerial subordinates at AIG.

Because SICO's stake in AIG was very large—comprising over 10% of the company's shares—participation in SICO was very lucrative. That was particularly true for the top-level AIG executives, including the Managerial Defendants, who each owned 8.33% of SICO. Those alleged facts are, in view of the narrowed focus of this case, simply context that indicates that SICO is essentially a vehicle that solidified Greenberg's control over AIG and its executives, because its large bloc of AIG stock enabled it to serve as a tool for control over them.

The claim that Teachers tries to advance related to SICO is pled very generally compared to the Starr Claims. The operative portions of the complaint are set forth in their entirety below:

> The other Starr entity, Starr International Co., Inc. ("SICO") received over $28.1 million in payments from AIG from 1999 to 2003 for undisclosed "services" and "rental" fees, when according to defendants this company exists for the primary purpose of paying out long term incentive compensation to AIG executives. As with other matters in the House of Hank, there is absolutely no indication that the AIG board of directors considered the fairness of these

self-interested transactions.[5]

\* \* \*

These defendants have breached their fiduciary duty of care by approving the payment of "service" and "rental" fees by AIG to SICO in 1999. These defendants utterly abdicated their duty to inform themselves about the propriety of paying these fees to SICO. Their sole consideration of the matter consisted of listening to the interested defendant Greenberg spend a few minutes at a board meeting to describe the relationship between SICO and AIG. They never conducted market surveys or any other valuation technique to gauge the fairness of the amount of the fees paid to SICO, and they did not participate in any way in negotiating the business transactions between SICO and AIG. In fact, there is no evidence that the Board even knows for what the service and rental fees were being paid.[6]

### III. *The Procedural Framework*

This case is before me now on a motion to dismiss. Given the history of the case, that posture should not be as problematic as it is. Although Teachers suffered considerable delay because of the special litigation committee process, Teachers also reaped certain advantages from that process. Those advantages included not only the opportunity to read the special litigation committee's extensive report and to obtain discrete discovery in response to the committee's prior motion to dismiss, but also to glean additional facts arising in the public domain because of the work of governmental agencies. Coupled with books and records Teachers received from AIG, these advantages put Teachers in a good position to craft a high-quality complaint.

To that point, Teachers also had an ideal opportunity to sharpen its pencil because of its agreement, made with other plaintiffs, AIG, and the defendants in other related lawsuits, to focus this case on the Starr and SICO Claims only. Most important, Teachers obtained the support of the special litigation committee to go forward on AIG's behalf with the Starr and SICO Claims against the Managerial Defendants and Starr. As a result of that support, Teachers no longer had to satisfy the more rigorous standard of pleading demand excusal under Rule 23.1, but simply had to state a claim upon which relief could be granted under Rule 12(b)(6).

Rather than use the opportunity to plead its Starr and SICO Claims again to its best advantage, Teachers essentially rested on its prior allegations. Then, in the face of the present dismissal motions, Teachers premised many of its arguments on documents well outside the four corners of its own complaint, seeking to amplify or in some cases contradict that pleading. This technique is more commonly deployed by defendants, frustrated by the requirement to attack a complaint on the basis that the pled facts are true and do not state a claim. Thus, defendants often attempt to end-run Rule 12(b)(6) by trying to demonstrate that the pled facts are not actually facts. Here, Teachers end-runs its own amended complaint, by pointing to the special litigation committee report as supporting the viability of its Starr and SICO Claims. That was improper and needlessly wasted the defendants' and the court's time and resources. The great thing about a complaint from a plaintiff's perspective is obvious: if the plaintiff and its counsel can make factual allegations

5. Am. Compl. ¶ 7.

6. *Id.* at ¶ 257.

with a good faith basis, then the story those allegations tell must be accepted by the court, with all inferences from the story being drawn in the plaintiff's favor. That is a really cool place to be, and not one that plaintiffs often seek to leave for an environment littered with extrinsic evidence.

To their credit, counsel for Teachers owned up to these departures from their usual standard of practice in oral argument. And although I am not pleased by the confusion and inefficiency generated by Teachers' approach, that approach was not so egregious as to justify refusing to address the key merits issue that remains: does the operative complaint, as written, state a claim? None of the arguments raised by Teachers in its papers suggest that that pleading, which I will refer to simply as the complaint from hereon, overstates the facts supporting the Starr and SICO Claims.

Therefore, I will apply the familiar Rule 12(b)(6) standard to address the motions. Under that standard, I am required to accept all well-pled facts as true and to draw all reasonable inferences from those facts in favor of Teachers.[7] But conclusory allegations are not an adequate substitute for the articulation of facts.[8] As indicated, I intend to confine myself largely to the four corners of the complaint, and will resist Teachers' unusual request to supplement its own complaint. That said, I agree with the defendants that it is appropriate to consider the MGA Agreements as being incorporated into the complaint and to consider their unambiguous terms in

addressing the defendants' motion to dismiss.[9]

## IV. *Legal Analysis*

With those standards in mind, the rest of this opinion proceeds as follows. As an initial matter, I address the defendants' argument that all of Teachers' Starr Claims are time-barred because the relationship between AIG and the various Starr insurance agencies were initiated by contracts dating from the 1970s, and that the failure of AIG stockholders to prosecute a suit in that decade or the early 1980s forecloses any later suit. Second, I address the defendants' argument that the complaint does not state a claim that the payments to Starr were improper. Third, I consider Starr's argument that no viable claim is pled as to it and that only a deficient claim for a particular remedy is pled. Finally, I evaluate the defendants' argument that the complaint fails to state a claim that the $28.1 million in payments to SICO were tainted by fiduciary misconduct.

### A. *Does The Doctrine Of Laches Bar Teachers' Starr Claims?*

■ Because the MGA Agreements were entered into more than three years before Teachers filed its initial complaint, and because three years is the measuring rod for the facial timeliness of claims for breach of fiduciary duty,[10] the defendants argue that the Starr Claims should be dismissed as time-barred. In support of that argument, the defendants rely upon cases that stand for the general proposi-

---

7. *See, e.g.,* Solomon v. Pathe Commc'ns Corp., 672 A.2d 35, 38 (Del.1996).

8. *See, e.g., Orman v. Cullman,* 794 A.2d 5, 15 (Del.Ch.2002).

9. *See, e.g., In re Santa Fe Pacific Corp. S'holder Litig.,* 669 A.2d 59, 69–70 (Del.1995); *In re*

Lukens Inc. S'holders Litig., 757 A.2d 720, 727 (Del.Ch.1999).

10. 10 *Del. C.* § 8106; *see Orloff v. Shulman,* 2005 WL 3272355, at *9 (Del.Ch. Nov.23, 2005).

tion that when a contract is contended to have resulted from fiduciary misconduct, the statute of limitations begins running at the time of the decision to contract, as the date of the key wrong. Performance under the contract, then, is generally considered as a *natural consequence* flowing from the original decision by the defendant-fiduciaries to obligate the corporation to the contract.[11]

Without questioning the general reasoning of that line of cases, one must still reject the defendants' arguments here. The reason why is suggested by each one of the MGA Agreements, which the defendants themselves submitted. Each of those contracts contains a provision granting AIG an annual right to terminate without penalty upon certain notice.[12] As Teachers argues, what the complaint challenges is the discretionary decision of the AIG director-defendants to continue doing business with Starr on terms that Teachers alleges were grossly unfair. Therefore, the complaint is not challenging the original decision of AIG to sign the MGA Agreements in the 1970s. It is attacking the allegedly disloyal and self-enriching decision of Greenberg, Matthews, and Smith to perpetuate an unfair relationship with Starr, with the supine complicity of the outside directors of AIG, who breached their duty of care by failing to understand,

much less knowingly approve, the Starr–AIG relationship.

Because the AIG board had the business option of choosing not to continue that relationship annually, the complaint is not untimely as to the payments made to Starr in the period 2000 to 2004—i.e., those payments beginning three years before the filing of the original complaint. To hold otherwise would be to create a rule of law protecting inertial stupidity and perfidy. One of the reasons why contracts have termination clauses is to permit a fresh business decision to be made about continuing past practices. Here, the complaint clearly pleads that the AIG board breached its fiduciary duties by deciding to continue dealings with Starr, even though the MGA Agreements gave them the opportunity to stop.

■ Unlike Teachers, however, I do not believe Teachers is free to challenge payments made in 1999. The original complaint was filed on December 31, 2002. According to Teachers, it is not time-barred in challenging payments to Starr for 1999 because the first public disclosure of the 1999 payments was made on March 30, 2000, when AIG filed its Form 10–K. As a result, it argues that it had a leisurely three years from the date of that disclo-

---

**11.** *See, e.g., Kahn v. Seaboard Corp.,* 625 A.2d 269, 271 (Del.Ch.1993) ("Here ... the 'continuing wrong' is performance of a contract. It is implicitly admitted that payments were ... as provided in the contract.... So long as the time charter is not rescinded, the payments it calls for are legal obligations, not wrongs. Thus, unlike a continuing wrong the only liability matter to be litigated involves ... authorizing the creation of these contract rights and liabilities."); *Marvel Entm't Group, Inc. v. Mafco Holdings, Inc.,* 273 B.R. 58, 73–74 (Bankr.D.Del.2002) (same).

**12.** For example, the Marine and Aviation MGA Agreements permit termination "at the end of any calendar year by any party giving to the other parties six (6) months' notice in writing of such desire." Greenberg and Matthews Op. Br. at Exs. B, C. The Starr Tech MGA Agreement permits termination "on the first day of January of any ensuing year by either party giving at least three (3) calendar months previous notice by registered letter stating when thereafter such termination shall be effective." *Id.* at Ex. D. Finally, the Starr MGA Agreement permits termination "by either party by giving not less than seventy-five days previous notice by registered letter or telegram...." *Id.* at Ex. E.

sure to bring suit. That, however, is not the law.

At the very least, Teachers was on inquiry notice that AIG was continuing to do business with Starr throughout 1999.[13] The MGA Agreements were long in existence by then and AIG had publicly disclosed its dealings with Starr for many years. Although non-disclosure of a wrong might act to excuse a late filing in certain circumstances, even by its own calculation, Teachers had from March 30, 2000 until December 31, 2001 to bring a timely claim regarding the 1999 payments. That is, Teachers not only had inquiry notice in 1999 of the wrongs occurring in 1999, it had actual notice of those wrongs by March 2000, well within the three-year limitations period.[14] There is no excuse for its torpor in filing.

Therefore, the motion to dismiss the Starr Claims as time-barred is denied as to the payments for 2000 to the present and granted as to the payments for 1999.

## B. Does The Complaint Plead A Claim For Breach Of Fiduciary Duty As To The Payments To Starr?

Much of the briefing on the question of whether the Starr Claims survive under Rule 12(b)(6) is devoted to the question of whether the AIG board was comprised of a majority of independent directors during the period 1999 to present. Some of that dilation is doubtless attributable to vestiges of prior drafts focused on Rule 23.1 and the issue of demand excusal, considerations that have now dropped out of the case.

The other reason is that the Managerial Defendants premise their dismissal motion on the argument that if the AIG was comprised of an independent board majority, then the decision of the AIG board to continue the Starr relationship is presumptively protected by the business judgment rule, whatever self-interest the inside AIG directors had being cabined adequately by the independent majority.

■ The question of whether the AIG board was comprised of an independent board majority during any or all of the relevant years is an interesting one. The AIG outside director ranks were populated with persons of great distinction in many fields. But some of them—for example, the President of the American Museum of Natural History—arguably blended their day jobs with their role at AIG, leading to colorable questions about whether they were beholden to Greenberg—long the dominant managerial force at AIG and its affiliate—for beneficence he had caused AIG to show to their employing institutions.[15] I need not, and therefore will not,

---

**13.** See, e.g., In re Dean Witter P'ship Litig., 1998 WL 442456, at *7 (Del.Ch. July 17, 1998) ("Inquiry notice does not require actual discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme"); Rudnitsky v. Rudnitsky, 2000 WL 1724234, at *7 (Del.Ch. Nov.14, 2000) ("Inquiry notice exists where a person has knowledge of such facts as would lead a fair and prudent person using ordinary care to make further inquiries.") (internal citations omitted).

**14.** In analogous circumstances, where a plaintiff was on inquiry notice for more than three years and, by its own admission, received actual notice and waited to sue for nearly two years, this court found the plaintiff's claims to be time-barred. See, e.g., Certainteed Corp. v. Celotex Corp., 2005 WL 217032, at *10 (Del.Ch. Jan.24, 2005).

**15.** To wit, it is alleged that the Starr Foundation, which is controlled by Greenberg, gave a $36.5 million gift to the American Museum of Natural History during this director's tenure. Am. Compl. ¶ 199. A primary obligation of the head of a museum is, unavoidably, raising funds. By way of a slightly different example,

rest my decision on a nose-counting approach because there is a more obvious reason why the defendants' dismissal motion must be denied, even if the AIG board majority was putatively independent by status.

The Managerial Defendants who remain in this case were not independent directors of AIG. They were insiders who stood to and did benefit materially from their ownership interest at Starr. Each had an incentive to tilt the Starr–AIG relationship unfairly in Starr's direction. That does not mean that they had a rational incentive to tilt it so unfairly that AIG failed as a business concern; more accurately, each had a self-interest in shifting a more than fair amount of the large profits AIG made to Starr in order to pump up the compensation of top AIG executives, in a manner that would be less than fully obvious to AIG's public stockholders. Given these incentives, it is impossible to conclude that the complaint merely attempts to plead due care violations against these defendants.

Nor can the Managerial Defendants take comfort in Teachers' decision to drop its claims against the outside directors of AIG. That decision was undoubtedly a pragmatic one, premised in no small measure on Teachers' recognition that AIG's charter contained an exculpatory provision exempting directors from monetary liability for fiduciary breaches of the duty of care. Because the outside directors of

the Starr Foundation also gave $1 million donations in 1999 and 2001 to a center for international affairs at a university, which is named for one of its distinguished outside directors. *Id.* at ¶ 203. Just what beholdenness does the average director feel towards those who fund the endowment of their eponym? The delicate questions that arise when such directors are essential to defendants' desire to demonstrate the independence of a board majority or special committee can be elided here.

AIG did not benefit personally from payments to Starr, to prove them liable, Teachers would have been required to demonstrate that they were disloyal to AIG for reasons other than self-enrichment. That is, Teachers faced the challenge of showing that the outside directors did not approve the continuation of the Starr relationship in the good faith belief that it was in the best interests of AIG— the traditional definition of a loyal (i.e., faithful) state of mind—but to advance some improper consideration. In all reality, Teachers would have confronted the most difficult task of all: demonstrating that the outside directors had breached their duty of care, not as a result of trying to do their job but still making mistakes of a gross nature, but because the directors' level of indolence was so extreme that it arose to a conscious decision to take the salary of a director while intentionally failing to discharge one's fiduciary obligations.

As this court has made clear in *In re Caremark Int'l Inc. Derivative Litig.*[16] and *Guttman v. Huang,*[17] that sort of conscious torpor in the face of duty is disloyal behavior, and the theoretical grounding for a claim of that nature is strong. But *Caremark* and *Guttman* also make clear that the burden of pleading and proving claims of that nature is rightly onerous, lest the business judgment rule's and § 102(b)(7)'s utility in encouraging risk-taking and board service be undermined.[18]

16. 698 A.2d 959 (Del.Ch.1996).

17. 823 A.2d 492 (Del.Ch.2003).

18. *See Caremark,* 698 A.2d at 971 (". . . in my opinion only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability. Such a test of liability—lack of good faith as evidenced by

The Managerial Defendants attempt to convert Teachers' rational decision to dismiss the outside directors into a concession that the outside directors discharged their fiduciary duties in reviewing and approving the Starr relationship. That is not Teachers' position.

By its plain terms, the complaint alleges that the AIG board, as a collective unit, did not adequately inform itself about the Starr relationship. Rather, the board relied blindly on Greenberg, after hearing a short song-and-dance from him annually. The outside directors did not employ any integrity-enhancing device, such as a special committee, to review the Starr relationship and to ensure that the relationship was not tainted by the self-interest of AIG executives who owned large stakes in Starr.

■ The informed approval of a conflict transaction by an independent board majority remains an important cleansing device under our law and can insulate the resulting decision from fairness review under the appropriate circumstances.[19] For that device to be given credit, however, the board majority must have acted in an informed manner.[20] The conflicted insider

---

sustained or systematic failure of a director to exercise reasonable oversight—is quite high. But, a demanding test of liability in the oversight context is probably beneficial to corporate shareholders as a class, as it is in the board decision context, since it makes board service by qualified persons more likely, while continuing to act as a stimulus to *good faith performance of duty* by such directors."); *Guttman,* 823 A.2d at 505–07 ("Although the *Caremark* decision is rightly seen as a prod towards the greater exercise of care by directors in monitoring their corporations' compliance with legal standards, by its plain and intentional terms, the opinion articulates a standard for liability for failures of oversight that requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith. Put otherwise, the decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs."); *see also In re Walt Disney Co. Derivative Litig.,* —— A.2d ——, ——, 2006 WL 1562466, at *27 ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and *its* shareholders, fiduciary conduct of this kind ... should be proscribed.").

19. There is more complexity about this subject now than there was, say, 45 years ago, mostly because of a line of decisions that focus on conflicted mergers with controlling stockholders. *See, e.g., In re Pure Resources, Inc.,* 808 A.2d 421, 433–43 (Del.Ch.2002) (describing this evolution). The precise extent to which that line of cases applies outside that context is an ongoing subject of debate. *See* WILLIAM T. ALLEN AND REINIER KRAAKMAN, COMMENTARIES AND CASES ON THE LAW OF BUSINESS ORGANIZATION 313 (2003 ed.) ("How then is the Court of Chancery likely to review an interested transaction between a company and one or two of its directors who are not affiliated with a controlling shareholder? It will employ business judgment review, we believe, as long as the remaining disinterested directors who approve the transaction cannot be shown to be misinformed, dominated, or manipulated in some fashion.").

20. *See, e.g., Marciano v. Nakash,* 535 A.2d 400, 405 n. 3 (Del.1987) ("approval by fully-informed disinterested directors under § 144(a)(1) ... permits invocation of the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction."); *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) ("[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties."); *see also* RODMAN WARD, JR., EDWARD P. WELCH, AND ANDREW J. TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 144.2.2 (4th ed.) ("To satisfy section 144(a)(1), the person seeking its protection must demonstrate that the directors approving the interested transaction were truly independent, fully informed, and had the

gets no credit for bending a curve ball past a group of uncurious Georges who fail to take the time to understand the nature of the conflict transactions at issue.

That is the circumstance raised by the complaint. According to that complaint, Greenberg simply gave a short presentation to the AIG board every year about Starr. Without understanding the complexity of that relationship and its implications, the board permitted management to continue with what the complaint alleges, with more than sufficient detail, to be a pattern of business that unduly advantaged Starr to AIG's unfair detriment. By logical inference, the complaint suggests that Matthews and Smith sat there quietly while their boss Greenberg provided the outside directors with what they knew to be merely cursory information, and did not speak up to suggest that the matter warranted more thorough consideration, although they knew it did.

In other words, the complaint alleges that the Managerial Defendants breached their fiduciary duty of loyalty by, for selfish reasons, perpetuating a relationship with Starr that was adverse to AIG. That an uninformed outside board majority let them breach their duties provides no basis for dismissal.

### C. Does The Complaint Plead A Claim Against Starr Itself?

I come now to a specific example of Teachers' lax approach to pleading. In a consolidation order agreed to by parties in several strains of related AIG litigation, Teachers agreed to dismiss Counts XVI–XXIX of the first amended complaint that was filed on May 17, 2005. All but one of those Counts dealt with conduct by AIG

insiders separate from the Starr and SICO Claims. But Count XXIX sought the imposition of a constructive trust on the assets of Starr. That Count was supposed to have been dismissed. Teachers did not dismiss it once it realized it dealt with the Starr Claims rather than the Marsh & McLennan "bid-rigging" claims. But rather than do what it should have—get the defendants to agree to amend the prior order—Teachers just failed to strike it. Bad form, but not so egregious to lead a trial judge to believe that an appellate court would or should have his back if he rested a dismissal order on that conduct. I therefore consider the merits of the count and the facts in the complaint that buttress it.

Count XXIX is the only count naming Starr as a defendant and its key paragraph simply states as follows:

> The business of Starr was developed with money and resources from AIG, and yet defendants Greenberg, Kanak, Matthews, Smith, Sullivan, Tizzio, Tse and Wintrob, owners of Starr, kept Starr as a separate entity. They caused Starr to engage in insurance transactions with AIG from 1999 to the present in which AIG paid hundreds of millions of dollars in commissions to Starr. During the same time period, Starr also collected and kept reinsurance commissions paid by non-AIG reinsurers, which payments/commissions rightfully belonged to AIG.[21]

■ As Starr rightly points out, this court cannot impose the remedy of a constructive trust against a party unless that party is properly subject to an order of relief under a recognized cause of action.[22]

---

freedom to negotiate at arm's length.") (internal citations omitted).

**21.** Am. Compl. ¶ 388.

**22.** Admittedly, there is case law that imprecisely discusses this distinction. But no controlling authority from our Supreme Court holds that there is such a thing as a "claim

Because the complaint does not attempt, by its own terms, to formulate the basis for a cause of action against Starr, Starr argues that the complaint against it must be dismissed.

The problem for Starr is that, however non-adroitly, Teachers has pled facts that, if true, support a cause of action against it under at least two independent theories. Admittedly, Teachers does not even use its answering brief to articulate these theories but it does explicitly argue that Starr is responsible for any wrongdoing committed by its controlling persons, including Greenberg, and it explicitly states what that conduct was and why that conduct supports the possible issuance of a constructive trust remedy. By doing this, Teachers has brought to my mind—and no doubt

the mind of Starr's able counsel—the two theories I now discuss.

 First and most obviously, the facts in the complaint suggest that the persons who controlled Starr, notably Greenberg, understood that Starr was getting an unfairly advantageous deal from AIG, which was also controlled by Greenberg and other Starr insiders. As a result, the pled facts make out a claim for aiding and abetting a breach of fiduciary duty against Starr, as Starr is fairly charged with the knowledge and conduct of its controlling persons.[23] Second, to the extent that Starr's controllers intentionally enriched Starr excessively to the detriment of AIG, the relationship between Starr and AIG is such that a claim for unjust enrichment might later be sustained.[24]

for a constructive trust" with its own unique elements. To find that was the case would, I believe, be a mistake. Unless a plaintiff can prove out a claim under a recognized cause of action—such as one for fraud, breach of fiduciary duty, or unjust enrichment—the plaintiff should have no eligibility for any remedy, including the remedy of constructive trust. *See, e.g., Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 991 (Del.Ch.2000) ("A constructive trust is simply one of many conceivable alternative remedies which might be available after trial should plaintiffs prevail on one or more of their theories of recovery."); DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12–7[b] at 12–77 ("Constructive trusts have been employed to remedy unjust enrichment in a variety of situations. They are perhaps most often imposed to remedy breaches of fiduciary duty or the wrongful acquisition of title to property through fraud, duress, or other unconscionable conduct.").

**23.** To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead: (1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach. *See Crescent/Mach I Partners, L.P.,* 846 A.2d at 989. An aiding and abetting claims also requires

that the breach caused damages. *See McGowan v. Ferro,* 859 A.2d 1012, 1041 (Del. Ch.2004). In addition, it is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation. *See, e.g., Carlson v. Hallinan,* 2006 WL 771722, at *21 (Del.Ch. Mar.21, 2006); *In re HealthSouth Corp. S'holders Litig.,* 845 A.2d 1096, 1108 n. 22 (Del.Ch.2003); *see also* 18A Am.Jur.2d CORPORATIONS § 1444 (2005).

**24.** Our Supreme Court has defined unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *See Schock v. Nash,* 732 A.2d 217, 232 (Del.1999); *Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1062 (Del.1988). But, it is also the case that when a contract governs the relationship between parties, a party cannot recover under a theory of unjust enrichment. *See ID Biomedical Corp. v. TM Tech., Inc.,* 1995 WL 130743, at *15 (Del.Ch. Mar.16, 1995). Therefore, I recognize that the existence of the MGA Agreements might complicate the applicability of this doctrine, and also the reality that unless the payments to Starr resulted from fiduciarily-deficient behavior at AIG, then the unjust enrichment theory would likely fail as well. For now, however, I cannot rule out

Either of these claims, if proven after trial, could theoretically support the imposition of a constructive trust.[25] As Starr also points out, a constructive trust may only be imposed "only upon specific property, ... identifiable proceeds of specific property, and even money so long as it resides in an identifiable fund to

the possibility that Teachers could succeed on an unjust enrichment claim.

25. The outward boundaries of the circumstances in which it is appropriate to order the remedy of constructive trust remain unclear. *See Adams v. Jankouskas,* 452 A.2d 148, 152 (Del.1982) ("[A] constructive trust does not arise from the presumed intent of the parties, but is imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another *to whom he owed some duty."); Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A.2d 377, 394 (Del.Ch.1999) ("Having pleaded sufficiently the allegations ... that [defendant] aided and abetted [an] alleged breach of fiduciary duty to a degree sufficient to defeat this motion, it is axiomatic that Plaintiffs have likewise pleaded sufficiently the allegations that Defendants were enriched by their actions: ... If Plaintiffs succeed on the merits of their breach of fiduciary duty and aiding and abetting claims, it is likely they will also be able to prove that neither Kennedy nor Fort James can retain any benefit resulting from the disputed transaction 'justifiably' or in accordance with 'the fundamental principles of justice or equity and good conscience.' Plaintiffs, therefore, properly state an actionable claim for unjust enrichment and imposition of a constructive trust."); *Nash v. Schock,* 1998 WL 474161, at *2 (Del.Ch. July 23, 1998) ("Constructive trusts are regularly imposed by courts of equity to remedy unjust enrichment."). What seems clear is that someone must have engaged in conduct that was either "fraudulent" or "unfair and unconscionable," with the question being whether the "and" between "unfair" and "unconscionable" in prior precedent signals the need for proof of both concepts or just alliterative flourish. *Hendry v. Hendry,* 2006 WL 1565254, at *10–11 (Del.Ch. May 26, 2006) (discussing this question). Contrary to Starr, I do not perceive there to be any rigid rule that the party who engaged in that conduct must be the person against whom the order of constructive trust is sought. A requirement of that kind would seem to undercut much of the

utility of the unjust enrichment cause of action, which is often deployed against persons who (although *not acting with scienter* themselves) are sufficiently aligned with a wrongdoer that they ought to disgorge an unearned benefit conferred upon them by the wrongdoer at the victim's expense. *See Schock,* 732 A.2d at 232 ("Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer."); *Smith v. Smitty McGee's, Inc.,* 1998 WL 246681, at *7 (Del.Ch. May 8, 1998) ("In a court of equity even if the [the former wife of defendant] may be free of wrongdoing, she can be ordered to make restitution to [the injured plaintiff] of any assets [her former husband, the defendant] obtained through his wrongdoing and then transferred to her."); *see also Schock,* 732 A.2d at 233–34 (permitting the imposition of a constructive trust on the car belonging to the daughter of the wrongdoer because "the proceeds of the constructive trust placed on the annuity that was illegally cashed in by Irma Schock were used to purchase the automobile"); Austin Wakeman Scott & William Franklin Fratcher, Scott on Trusts § 470 (4th ed. 1989) ("Where a person holding property transfers it to another in violation of his duty to a third person, the third person can reach the property in the hands of the transferee, unless the transferee is a bona fide purchaser.... The cases involving transfers of property in fraud of creditors of the transferor are legion.... The transferee in these cases will not be permitted to retain the property as against the defrauded creditors unless he is in the position of a bona fide purchaser. The transferee holds the property upon a constructive trust for the creditors."); *see also White v. Mulvania,* 575 S.W.2d 184, 189–90 (Mo.1979) (quoting J. Perry, 1 Perry on Trusts and Trustees § 211 (7th ed. 1929)) ("So property obtained by one through the fraudulent practices of a third person will be held under a constructive trust for the person defrauded, though the person receiving the benefit is innocent of collusion. If such person accepts the property, he adopts the means by which it was procured; or as Lord Ch. Justice Wilmot said, 'Let the hand receiving the gift be ever so chaste, yet if it comes

which the plaintiff can trace equitable ownership."[26] Because Starr allegedly paid out much of its income—including that attributable to its MGA Agreements with AIG—to its equity holders, Starr contends that Teachers cannot secure the imposition of a constructive trust because its own complaint suggests that it will be impossible to trace the cash that Starr received from AIG with the necessary precision.

■ At this early stage, it would be inappropriate to deny Teachers the opportunity to make the appropriate showing that specific funds remain in Starr's hands that are attributable to excessive payments from AIG.[27] Even more important, the Supreme Court's teachings in *Hogg v. Walker* indicate that a constructive trust can be entered against a defendant even if the defendant no longer possesses the property improperly taken from the plaintiff, on the grounds that the trust originally arose at the time the defendant improperly received the plaintiff's funds. Overall, *Hogg* might be most fairly read as standing for the proposition that equity has a kitbag full of remedies and that the mere dissipation of the proceeds received from the

plaintiff by the defendant does not render the defendant safe from an equitable remedy requiring economic restitution to the plaintiff.[28] Here, the complaint also contains a catch-all demand for damages against all defendants, including Starr. What Teachers really wants is for Starr to be jointly responsible for rectifying any harm to AIG in which it was complicit. Even though Teachers' approach to pleading claims against Starr was inexcusably sloppy, the complaint pleads facts that put Starr on fair notice of the conduct that is alleged to justify Teachers' claims against it.[29] Starr knows that it is being asked to make AIG whole for payments it received from AIG, payments that are alleged to have resulted from improper conduct by Starr's key insiders, including Greenberg, who allegedly dominated both Starr and AIG.

Thus, Starr's motion to dismiss is denied. But, to avoid future confusion, Teachers shall amend its complaint to state proper claims against Starr, limited to what I have discussed. It shall pay the reasonable attorneys fees required for Starr and the other defendants to answer,

through a polluted channel, the obligation of restitution will follow it.' ").

26. WOLFE & PITTENGER § 12–7[b] at 12–75, 76.

27. Under the teaching of our Supreme Court, a constructive trust is deemed to arise when the defendant improperly receives the victim's property. *Hogg v. Walker*, 622 A.2d 648, 652 (Del.1993). Therefore, the Supreme Court has indicated that several remedial options are available to the Court of Chancery even when the defendant has purported to transfer the property at issue. These include: 1) deeming any payments out of the defendant's coffers to have been of the defendant's own property, and considering the plaintiff's funds to have been retained by the defendant; or 2) ordering the defendant to account for any diminishment in the trust, through a surcharge, replenishment, or damages order. *Id.* at 653–54.

28. *Id.* at 654 ("It is, of course, entirely possible that the proceeds were dissipated by the time of the trust's imposition. That, however, does not defeat the effect of the trust.... Thus, the trial court has broad latitude to exercise its equitable powers to craft a remedy.").

29. Sometimes the imposition of a constructive trust over specific property can afford a plaintiff relief in a context where an award of damages would, for various reasons such as a defendant's insolvency, be inadequate. WOLFE & PITTENGER § 12–7[b] at 12–76. At other times, plaintiffs attempt to plead a request for a constructive trust in order to obtain jurisdiction in this court, but the plaintiffs will only succeed if the underlying cause of action is equitable in nature (e.g., such as a claim for breach of fiduciary duty) or it appears that an award of monetary damages at law would be inadequate. *Id.*

as the need for these clarifying pleadings is solely attributable to Teachers' infelicitous drafting.

### D. Do The SICO Claims Pass Muster?

I come to another needlessly annoying question: are the SICO Claims supported by facts that, if true, support a cause of action? As the defendants note, Teachers did not even bother to plead the conclusory allegation that the payments for services and rental fees were unfair. The defendants also argue that Teachers, which cited liberally to the special litigation committee report in its papers, could have used that report to put flesh on the pleading bone.

For its part, Teachers argues that the public disclosures of AIG provided the investing public with no useful description for the services and physical plant that SICO supposedly provided to AIG in exchange for over $28.1 million from 1999 to 2003, and another $5.4 million in 2004, a figure that was only disclosed publicly after the current complaint was filed. Moreover, Teachers argues that it made a books and records demand covering the SICO payments and received no indication that the board ever considered the fairness of these payments. Why pray tell, Teachers asks, did AIG, a massive multinational insurance company, need to contract for services and facilities from SICO, an entity that exists primarily as a vehicle to provide long term compensation to AIG executives?

In the end, my conclusion rests on the liberal pleading standard of Rule 8(a), the implementation of that standard in our state's Rule 12(b)(6) jurisprudence, and the corporate law standard of review that applies to the SICO Claims. By reasonable implication, the bare-bones SICO Claims allege that AIG did not get fair value for the services and rental fees it paid to SICO. By its explicit terms, the complaint alleges that the supposedly independent directors of AIG did not make an informed decision to set the terms for those payments to SICO, but that those terms were set by Greenberg and others of his top subordinates who stood to benefit as SICO stockholders if the terms were unfair to AIG and overly favorable to SICO. In other words, the pleading alleges that the exchanges between AIG and SICO are subject to the entire fairness standard as their terms were set by AIG executives with an interest in benefiting SICO.[30] No procedural safeguards were used (such as negotiation and/or approval of these affili-

---

**30.** See, e.g., Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1279 (Del.1989) ("... judicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries. Here, not only was there such deception, but the board's own lack of oversight in structuring and directing the auction afforded management the opportunity to indulge in the misconduct which occurred. In such a context, the challenged transaction must withstand rigorous judicial scrutiny under the exacting standards of entire fairness."); Bomarko, Inc. v. Int'l Telecharge Inc., 794 A.2d 1161, 1178 (Del.1999) (same); Technicorp Int'l II, Inc. v. Johnston, 2000 WL 713750, at *16 (Del.Ch. May 31, 2000) ("Corporate officers and directors, like all fiduciaries, have the burden of showing that they dealt properly with corporate funds and other assets entrusted to their care. Where, as here, fiduciaries exercise exclusive power to control the disposition of corporate funds and their exercise is challenged by a beneficiary, the fiduciaries have a duty to account for their disposition of those funds, i.e., to establish the purpose, amount, and propriety of the disbursements. And where, as here, the fiduciaries cause those funds to be used for self-interested purposes, i.e., to be paid to themselves or to others for the fiduciaries' benefit, they have 'the burden of establishing [the transactions'] entire fairness, sufficient to pass the test of careful scrutiny by the court.'") (internal citations omitted).

ated transactions by the AIG audit committee, a common technique) nor was there even an adequate review by the full AIG board.

■ As such, Teachers has pled facts that suggest that the exchanges are subject to the entire fairness standard of review. Perhaps the fundamental purpose of the entire fairness standard is to impose the burden on the proponents of a self-dealing transaction that was implemented without any procedures that act as a fair proxy for genuine arm's length negotiations, to come forward with proof that the transaction was fair to the corporation.[31] Lacking the confidence in the transactional price that results when open market competition sets the terms of exchange, the law requires that those who set the terms and who had a self-interest in conflict with the corporation's best interests demonstrate that they treated the corporation fairly. In this context where terms have been set by conflicted fiduciaries, it is they who must fill the informational void with evidence demonstrating the financial fairness of their actions.

Here, the complaint pleads facts justifying the imposition of this burden on the remaining Managerial Defendants, all of whom stood to benefit if SICO was enriched at AIG's expense. Therefore, in spite of the sloppy nature of the pleading, I deny the motion to dismiss the SICO Claims.

## V. *Conclusion*

■ For all these reasons, the defendants' motions to dismiss are denied,[32] ex-

---

31. *See, e.g., AC Acquisitions Corp. v. Anderson, Clayton & Co.*, 519 A.2d 103, 111 (Del.Ch. 1986) ("[The] unwillingness to assess the merits (or fairness) of business decisions of necessity ends when a transaction is one involving a predominately interested board with a financial interest in the transaction adverse to the corporation. In that setting there is no alternative to a judicial evaluation of the fairness of the terms of the transaction other than the unacceptable one of leaving shareholders unprotected. Thus, where a self-interested corporate fiduciary has set the terms of a transaction and caused its effectuation, it will be required to establish the entire fairness of the transaction to a reviewing court's satisfaction."); *Pinson v. Campbell–Taggart, Inc.*, 1989 WL 17438, at *5 (Del.Ch. Feb.28, 1989) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983)) ("... the rationale for imposing the 'entire fairness' burden is that in a self dealing transaction, the minority shareholders' interests are not being adequately safeguarded, because the fiduciaries charged with protecting the minority have a conflicting self-interest. Our law, therefore, creates compensating procedural safeguards by subjecting those fiduciaries to the exacting requirement that they demonstrate to a carefully scrutinizing court 'their utmost good faith and the most scrupulous inherent fairness of the bargain.' "); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U.L.Rev. 449, 461 (2002) (describing the basic policy rationale of entire fairness review as "the difficulty in ascertaining, in non-arms-length transactions, the price at which the deal would have been effected in the market"); Symposium, *Judicial Standards of Review of Corporate Fiduciary Action*, 26 Del J. Corp. L. 995, 1004 (2001) (remarks of Vice Chancellor, now Justice, Jacobs) ("There are two rationales for entire fairness review [of conflict transactions] ... where the transaction is approved by conflicted directors.... [N]ormally when unconflicted directors negotiate on behalf of all the stockholders, you attain a market-priced transaction value. That result cannot be presumed when the directors are conflicted.").

32. Defendant Smith argues that the complaint fails to state a claim against him because it does not contain specific allegations regarding his conduct. For purposes of stating a claim against Smith, however, the pleading suffices. Summarized fairly, the complaint pleads the following: Smith allegedly was AIG's CFO, Executive Vice President and director at all relevant times, and resigned his managerial positions for failure to

cept as to Teachers' challenge to the payments to Starr made before January 1, 2000, which are dismissed on the ground of laches. Teachers shall submit an order, approved as to form, within ten days. That order shall also amend the prior stipulated order requiring the dismissal of Count XXIX.

As I close, the reality that Teachers' pleading and briefing practices have made reaching these conclusions more time-consuming for me and the defendants than should have been the case bears repeating.

For that reason, Teachers must clean up the complaint and bear the defendants' cost of responding to it. Moreover, if it turns out, upon later proof, that Teachers had no legitimate basis for pleading the Starr and SICO Claims, the defendants can seek further relief.

cooperate with regulators. He owned very large stakes in Starr and SICO, and was a director of both companies. He was Greenberg's loyal and trusted subordinate. From these facts, it is reasonable to infer that Smith both understood the terms of the unfair dealings between AIG, on the one hand, and Starr and SICO on the other, did nothing to cause the outside directors of AIG to become familiar with those dealings, stood to benefit if Starr and SICO were advantaged at AIG's expense, and supported the continuation of those practices, to his own personal benefit and to AIG's detriment. At a later stage, this rendition may be proved demonstrably wrong but it is the rendition that fairly arises from the complaint and it supports the claims for breach of fiduciary duty against Smith.